IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 10, 2006

**STATE OF TENNESSEE v. ALBERT JONES**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-02543     J.C. McLin, Judge**

_____

**No. W2004-02554-CCA-R3-CD  - Filed March 17, 2006**

_____

The defendant, Albert Jones, was convicted by a Shelby County Criminal Court jury of first degree premeditated murder and sentenced to life imprisonment.  In this direct appeal, he argues that the evidence was insufficient to sustain a first degree murder conviction and the trial court erred by denying his request for a special jury instruction on the State's burden of proof.  Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, JJ., joined.

Robert Wilson Jones, Shelby County Public Defender; Tony N. Brayton, Assistant Public Defender (on appeal); and Michael Johnson and Constance Barnes, Assistant Public Defenders (at trial), for the appellant, Albert Jones.

Paul G. Summers, Attorney General and Reporter; Blind Akrawi, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lee Coffee and Stacy McEndree, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On August 27, 2002, the naked body of the victim, Sheila Nance, was discovered in a vacant Memphis apartment located next door to the defendant's apartment.  Although the victim's throat had been slashed, there was only a small amount of blood at the scene, indicating the victim had been killed elsewhere and her body dumped in the vacant apartment.  Suspicion soon centered on the defendant, who had been seen entering his apartment with the victim on Saturday, August 24, and leaving the apartment alone less than an hour later.  A subsequent search of the defendant's apartment uncovered, among other things, bloodstains throughout the defendant's bedroom and the

victim's purse underneath the bed. The defendant was eventually located at a friend's home, arrested, and brought to the homicide office, where he gave two different statements to police. In the second statement, the defendant claimed he had hired the victim and the victim's female friend to perform sexual favors in exchange for crack cocaine, the victim's friend had robbed him at gunpoint and fled, and he had struck and stabbed the victim in retaliation. On April 22, 2003, the Shelby County Grand Jury returned an indictment charging the defendant with the first degree premeditated murder of the victim, and on August 16, 2004, the defendant proceeded to trial on that charge.

The victim's mother, Lillian Davis, testified at trial that the forty-six-year-old victim was a kind person who enjoyed helping others. She emphatically denied that the victim had been a prostitute and explained that although the victim was not employed, she was able to support herself with the assistance Davis provided her as well as the disability benefits she received. Davis said she last saw the victim alive at approximately 1:00 a.m. on Sunday morning when the victim came to her home to get some Tylenol. She later agreed, however, that Saturday, August 24, was the date she last saw the victim. She stated that on Tuesday, August 27, police officers informed her that the victim was dead.

Lavell Townsel, the victim's roommate, testified the victim awakened him at 9:00 or 9:30 a.m. on Saturday, August 24, 2002, asking to borrow his 1982 Cadillac Fleetwood. He said the victim was accompanied by a man who left with her as soon as Townsel handed the victim the car keys. When he next saw the vehicle at 7:00 or 8:00 that evening, it was parked behind "Oil City" on Elvis Presley Boulevard with a leak in the gas tank. According to Townsel, a mechanic, the gas tank had not been damaged when he loaned the vehicle, which actually belonged to his nephew, to the victim. Townsel made a positive courtroom identification of the defendant as the man who had been with the victim. He testified that, to his knowledge, the victim was not a prostitute and had never traded sex for drugs or money. On cross-examination, he acknowledged that the victim drank alcohol, used marijuana, and smoked crack cocaine.

Martrice Hampton testified that on August 24, 2002, she lived approximately two doors from the defendant in the Magnolia Place Apartments on Millbranch. She said the defendant usually lived with his girlfriend and her children but that the utilities to the defendant's apartment had been cut off and, consequently, on August 24, 2002, it had been about two days since she had seen the girlfriend or the children. Hampton testified that at approximately 11:00 a.m. that day, the defendant, who was accompanied by a woman she did not know, drove up to the apartment in an old Cadillac. She said the defendant got out of the car and went upstairs to his apartment. About two minutes later, the woman passenger, who was tall and had large hips, followed the defendant into the apartment. According to Hampton, neither the defendant nor the woman appeared to be intoxicated or under the influence of any drugs.

Hampton testified that about twenty minutes later a friend of hers knocked loudly on the defendant's door, intending to inform the defendant that something was leaking out of the bottom of the vehicle, but no one answered the door. Approximately thirty minutes later, the sweaty

defendant came out of the apartment, ran down the stairs to the vehicle, and drove off. Twenty to twenty-five minutes later, he returned to the apartment on foot, went back inside, and stayed ten or fifteen minutes before leaving again. Hampton testified she never saw the defendant at the apartment again. She further testified that she did not see anyone other than the defendant enter or leave the apartment after the woman had followed the defendant inside. On cross-examination, Hampton acknowledged she did not speak to the defendant or the woman and therefore did not know if either of them was under the influence of an intoxicant.

Joshua Heady, a contractor, testified that early on the morning of Tuesday, August 27, 2002, he and an assistant entered a vacant unit in the Magnolia Place Apartments to repair damaged Sheetrock. He said that because the smell inside the apartment was "intense," he sent his assistant to the back of the apartment to open the bedroom windows while he opened the windows in the front of the apartment. When his assistant returned to the living room to report that he had seen someone asleep, Heady went into the bedroom, approached the victim, and leaned down to wake her. When he did so, however, he immediately realized that she was dead and called 9-1-1. Heady testified that the victim was naked and that the left side of her face was swollen and badly injured. He said that when he and his assistant entered the apartment, they saw drag marks in the broken Sheetrock on the kitchen floor.

Memphis Police Officer Patricia Turnmire of the Crime Scene Unit testified that when she arrived at the apartment early on the morning of August 27, 2002, she found the victim's nude body lying face up on the floor with what appeared to be a stab wound to her neck and dried blood on her face. She said the presence of drag marks on the floor, combined with the absence of any blood in the apartment other than in the area where the victim was found, indicated that the victim had been killed elsewhere.

Memphis Police Officer Danny James testified that on August 28, 2002, he was assigned to the Crime Scene Unit and processed a bedroom in an apartment located next door to the vacant apartment where the victim's body was found. He said he found bloodstains on the floor and wall of the bedroom, as well as on a mattress and box springs. In addition, he found a steak knife lying on top of some clothing in the corner of the bedroom and a purse underneath the bed. Inside the purse were several letters and receipts bearing the victim's name.

Memphis Police Officer Ricky Davison of the Crime Response Unit, who processed the 1982 Cadillac on August 28, 2002, testified he found a brown-handled steak knife with a four-inch blade on the backseat cushion on the driver's side.

Tyrone McKinney testified he had recently pled guilty to a drug offense and was currently housed in the county jail, where he and the defendant had shared the same pod since May. He acknowledged he had previously been convicted of a number of theft offenses, as well as a robbery in 1999 for which he had received a four-year sentence. He said he and the defendant were talking about women one day when the defendant told him a story about killing a woman in his apartment. According to McKinney's testimony, the defendant related the following: he had picked up a woman

at "Pure Passion" and given her $40 for oral sex; had taken the woman and her friend to his Magnolia Place apartment; had been robbed at gunpoint by the woman's friend as he was simultaneously snorting cocaine and receiving oral sex from the woman; had struck the woman in the head with a clock as she attempted to flee from the apartment after her friend; had returned to the apartment to find that the woman had regained consciousness; had struggled with the woman, striking her with his fists and then stabbing her in the neck with a knife; had left the apartment again; had returned to find the woman lying dead on his bedroom floor; and had then dragged the woman's body into the empty apartment next door.

McKinney testified that the defendant gave him two different versions of the story, telling him in one that he had left his apartment in his own vehicle and in the other that he had used the victim's vehicle. He said the defendant told him that he had given two different statements to police and that he also said he should blame the murder on his girlfriend because it was his girlfriend's mother who had turned him in. McKinney stated that the defendant said his only mistake was in failing to clean all the blood from his apartment. On cross-examination, he acknowledged the defendant told him he had been high on cocaine at the time of the murder.

Captain James Fitzpatrick of the Memphis Police Department testified that on August 27, 2002, he was assigned to the homicide bureau and called to apartment number eight in the Magnolia Place Apartments in response to the discovery of the victim's body. He said that when he arrived, he found the naked victim lying partially in and partially out of a closet in the southeast bedroom of the apartment. The victim had a large wound in her neck that went from one side to the other, a blackened and swollen left eye, scratches and cuts on her arms that appeared to be defensive wounds, and various other bruises and contusions on her body. Captain Fitzpatrick stated that he was able to identify the victim by her fingerprints, which were on file with the research and identification section of the police department.

Captain Fitzpatrick testified that a telephone call the police department received from a concerned citizen on the evening of August 27, informing them that the defendant had been seen entering his apartment with the victim, led him to obtain a search warrant for the defendant's apartment on Wednesday morning, August 28. He said when he and his fellow officers arrived at the apartment that morning, which was apartment number six, they found the doors locked and a couch wedged against the inside of the front door. Inside the apartment, they found a bloodstain on the floor in the living room, blood spatters on the north and west walls of the southeast bedroom, blood spatter on a pile of clothing on the floor at the foot of the bed in that bedroom, and a pool of coagulated blood on the floor beside the clothing. When they moved the bed covers, they saw that blood had soaked through the mattress and box springs before pooling on the floor. They also found a knife in the bedroom, which could have been used as a weapon, as well as various assorted dishes and utensils that had been used for eating.

Captain Fitzpatrick testified that there was an odor of Pine-Sol in the kitchen and visible streaks on the floor, revealing that the floor had recently been mopped. There was also a bloodstained blanket in the kitchen, a towel with "slight traces of red on it," which had been used

for scrubbing, and various other cleaning materials, including a bottle of Pine-Sol. He stated that the blood on the living room floor of the defendant's apartment, combined with bloodstains and drag marks in the vacant apartment, showed that the victim had been dragged from the bedroom in the defendant's apartment, through the living room and kitchen, out the back door, into and through the kitchen of the vacant apartment, and into the bedroom where her body had been discovered. He estimated that the back doors of the respective apartments were less than five feet apart.

Captain Fitzpatrick testified that he enlisted the aid of the gang task force to find the defendant but was not successful until September 2, when he and Sergeant Simms, acting on a tip from the defendant's girlfriend's mother, located the defendant and his girlfriend, Laqisha Thacker, at 3041 Wesley, the Memphis home of one of the defendant's acquaintances. He said that, prior to that date, he had received information that the two might be at a Red Roof Inn in Southaven, Mississippi, and, upon investigation, had learned that they had checked into a room on August 26 but checked out on August 27. Captain Fitzpatrick testified that the defendant did not have any weapons on him at the time of his arrest on September 2, but he did have a bullet which fit an old, rusty gun found at the Wesley residence.

Captain Fitzpatrick testified that the defendant was transported from the Wesley residence to the homicide office, where he read him his rights and the defendant signed a written waiver before making an initial statement. In that statement, which was admitted as an exhibit at trial, the defendant said he had picked the victim up on the streets, given her forty or fifty dollars to rent her car, and then dropped her back off at a gas station. He specifically denied that the victim had been in his apartment or that he had anything to do with her death. The defendant's first statement reads in pertinent part:

> I was walking down Clementine and I seen [the victim], asked how much she charged for some head. I then said that's okay how much will you charge me to keep the car and she said forty for [sic] fifty dollars. The car was parked on Clementine and we drove up there to her house and we went inside the house and chilled out. We talked to her brother and stuff. We went and got the whiskey for him before we went to the house and chilled out. We went up there then we chilled and then we left and went to my house, and I ran up stairs and got the forty dollars and ran back down stairs and got in the car and rode to the gas station Seventy-Six gas station. She got out and I asked her where she was going and she said she knew some friends behind the car wash w[h]ere all the smokers be at and I said okay. I put two dollars in the car and by the time I made it by Clementine I was going up there by Oil City the car ran out of gas, then the car cut off and I tried to crank it again and it cut off and I got out and smelled the gas and then I walked up to my cousin['s] house.

Captain Fitzpatrick testified that after making the first statement, the defendant requested and received permission to talk to Ms. Thacker and then told him that he wanted to clear up some matters from his first statement. He said the defendant was once again informed of his rights and voluntarily waived his rights before making a second statement. In the second statement, also admitted as an

exhibit, the defendant said that he and the victim had met a friend of the victim's outside the victim's brother's house and that he had taken both women to his apartment. He stated that he had paid the victim $40 or $50 to rent the car and, when they arrived at the apartment, gave both women five or six rocks of crack cocaine in exchange for sex. He said he had snorted a small amount of powder cocaine earlier in the car. The defendant stated that the victim's friend performed oral sex on him and that both women smoked cocaine. He said the victim's friend next pulled out a gun, robbed him of approximately $450, and fled out the door. He stated that the victim tried to flee as well, but he caught her in the kitchen. He described what next ensued:

> I grabbed her by her hair and took her to the bedroom. I pulled her on the side of the bed where there is a little table. I took a radio off of the table and hit her up side the head and asked her, "where that other bitch going[?]" She said, "fuck you," and I stuck her.

> After I stuck he[r], she fell and I ran out the door. I jumped in the car and went to see if I saw the other woman. I went back toward Clementine (Warren Apts), and didn't see her walking down Millbranch, so I was heading over [to] my brother's house and ran out of gas. I left the car where it was behind Oil City and walked back up to my cousin Portia's house in the Clementine. I got to Portia's and Ke-Ke [the defendant's girlfriend] was there and I remained calm and didn't tell her what was going on.

> About 3:00 am, after everybody was [a]sleep, I got up and walked back over to my apartment. I went in and the woman was laying [sic] there in the bedroom at the foot of the bed, sitting on the floor with he[r] head against the bed. I grabbed her by her feet and drug her next door. I left her in the bedroom on the right. I went back and locked my door, because I had left it unlocked when I left the first time. I walked back to Portia's house and on the way I threw the knife in a dumpster in the Millbranch Apts. I walked in the complex and threw it in the first one I got to. When I got back to Portia's house, Ke-Ke was up and asked where I had been. I told her that I had been to the "house." She didn't believe me but she didn't give me much static, we been together three (3) years. She never gives me any problems.

Captain Fitzpatrick testified that there were several inconsistencies in the defendant's statement, including a claim he made that he had left the keys to the Cadillac inside the vehicle's trunk. Captain Fitzpatrick stated that a brown steak knife with a serrated edge was found on the backseat of the vehicle, but the car's keys were located in the Southaven, Mississippi, motel room which had been rented by the defendant and Ms. Thacker.

The State's final witness was Dr. Teresa Campbell, the Shelby County assistant medical examiner who performed the autopsy of the victim's body. She testified the victim's blood-alcohol level was .205, which could have resulted from the decomposition of her body, her ingestion of alcohol, or a combination of the two. She said she also detected the presence of benzoylecgonine, "a breakdown product of cocaine," in the victim's body, indicating that the victim had consumed

cocaine at some point prior to her death. Dr. Campbell stated that the victim had a number of bruises, contusions, and cuts on her body, including the following: various contusions to her face, an incised wound to her neck, several small "rag contusions or bruises" to her chest, "linear, punctate abrasions . . . suggestive of a serrated instrument" to her left shoulder, "a grouping of . . . small scrapes and bruises" to her abdomen, a small red bruise to her left thigh, an incised wound or cut to her left upper arm with a small red bruise beside it, superficial linear scrapes on the right forearm, and several incised wounds or cuts to the back of her right wrist and hand, which could be described as defensive wounds. In addition, the victim had several "linear punctate abrasions" to her right arm that were yellow in color, indicating that those injuries occurred after her death.

Dr. Campbell testified that the cause of death was the incised wound to the neck, which cut branches of the victim's right external carotid artery and left internal jugular vein and penetrated the victim's pharynx, causing the victim to breathe blood into her lungs. She stated that the victim's death was not instantaneous and estimated the victim had lived anywhere from ten to thirty minutes after her throat was cut. Dr. Campbell described the incised wound to the victim's neck as a confluence of a 7-inch-long incision and a 5.3-inch-long incision, but explained that the wounds did not necessarily occur at separate times:

> The cut actually starts over here with like a dragging, a drag mark on the skin and then goes deep. And then actually there's drag marks extending over to this side of the neck. And then there's an additional cut going here. So I described it as a confluence of two incisions because there is a cut going this way and a cut going that way. In fact, it doesn't necessarily mean that there was like here to here and then a cut from here to here. There could have been a cut from here to here and maybe a little movement of the knife which then caused the cut going this way.

On cross-examination, Dr. Campbell conceded that the victim's death could have occurred fairly quickly, in less than ten minutes, if the victim had sucked air into her veins, causing an air bubble to travel to her heart. She said, however, that the degree of decomposition of the victim's body prevented her from being able to determine if that had occurred.

The defendant elected not to testify and rested his case without presenting any proof. Following deliberations, the jury convicted him of the first degree premeditated murder of the victim.

## I. Sufficiency of the Evidence

As his first issue, the defendant challenges the sufficiency of the evidence in support of his first degree premeditated murder conviction. When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to

support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of first degree murder, defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1997 & 2003). Premeditation is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d) (1997 & 2003).

Whether premeditation exists is a question for the jury to determine based on the evidence, and it may be established by the defendant's conduct and the circumstances surrounding the killing. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our courts have listed a number of different facts from which premeditation may be inferred, including evidence the defendant had a motive for the killing; evidence that the defendant procured a weapon; the defendant's declarations of an intent to kill; evidence the defendant made preparations to conceal the crime before the killing; the defendant's use of a deadly weapon on an unarmed victim; the particular cruelty of the killing; evidence that the victim was retreating or attempting to

flee; infliction of multiple wounds; evidence of the defendant's calmness immediately following the killing; and the defendant's destruction or secretion of evidence after the killing. See State v. Dellinger, 79 S.W.3d 458, 492 (Tenn.), cert. denied, 537 U.S. 1090, 123 S. Ct. 695, 154 L. Ed. 2d 635 (2002); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); Bland, 958 S.W.2d at 660; State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

The defendant contends that the State failed to prove premeditation beyond a reasonable doubt and that the evidence instead supports a conviction for second degree murder. In support, he relies heavily on the fact that there was no evidence that he had a prior relationship with the victim or planned her murder in advance. The State argues that there was sufficient evidence of premeditation to sustain the jury's verdict, including the extensive injuries inflicted on the victim, the fact that the victim was unarmed, and the steps the defendant took to conceal the crime after the killing. We agree with the State.

When viewed in the light most favorable to the State, there was ample evidence to show beyond a reasonable doubt that the defendant committed an intentional and premeditated killing of the victim. By the defendant's own admission, the victim was attempting to flee and was not armed at the time he killed her. His statement to police also reveals that he remained calm after the killing, first searching for the victim's friend and then returning to his cousin's house and waiting until everyone was asleep before going back to the apartment to conceal the body and dispose of the murder weapon. Such calmness in the immediate aftermath of a brutal killing supports the jury's finding that the act was premeditated. Moreover, the defendant's pod mate related that the defendant had told him that he did not kill the victim until sometime after the robbery, after he had first struck the victim in the head, left, and then returned to the apartment. Further evidence in support of the finding of premeditation is the extensive, multiple injuries inflicted on the victim and the particularly cruel nature of the murder, in which the victim's throat was slit from one side to the other, causing her to lose massive amounts of blood as well as to suffocate on her own blood. We, therefore, conclude that the evidence was sufficient for a rational trier of fact to find the defendant guilty beyond a reasonable doubt of first degree premeditated murder.

## II. Special Jury Instruction

The defendant next contends that the trial court committed prejudicial error by refusing his request for a special jury instruction on the State's burden of proof.

Defendants have a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). As long as the instructions given are correct statements of the law and "fully and fairly set forth the applicable law," the trial court does not commit error in "refus[ing] to give a special instruction requested by a party." State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987).

The record reflects that the trial court correctly instructed the jury with the pattern jury instructions on the State's burden of proof and the elements required to prove a premeditated murder. We, therefore, agree with the State that the instructions contained a fair and accurate statement of the law and that the trial court did not err in refusing to give the special instruction requested by the defendant.

## **CONCLUSION**

Having reviewed the record, we conclude that the evidence was sufficient to sustain the first degree premeditated murder conviction and that the trial court did not err in refusing the special jury instruction requested by the defendant. Accordingly, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE